**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON, SUBSCRIBING TO
POLICY NUMBER 501/NB03ACMD,

       Plaintiff,

vs.                                                                    No. CIV-04-0937 JB/WDS

STEVEN NANCE AND L.J. DOLLOFF
ASSOCIATES OF NEW MEXICO, INC., a
New Mexico Corporation,

       Defendants.

STEVEN NANCE,

       Counterplaintiff, Crossplaintiff, and Additional Party Plaintiff,

vs.

CERTAIN UNDERWRITERS AT
UNDERWRITERS, LONDON, SUBSCRIBING TO
POLICY NUMBER 501/NB03ACMD,

       Counterdefendant,

L.J. DOLLOFF ASSOCIATES OF NEW MEXICO, INC.,

       Cross Defendant, and

L.J. DOLLOFF ASSOCIATES, INC.,

       Additional Party Defendant.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

**THIS MATTER** comes before the Court after a bench trial the Court held in this case from

May 29, 2007 through May 31, 2007.  The primary issues are: (i) whether Additional Party

Defendant L.J. Dolloff Associates, Inc. ("Dolloff New York") is the alter-ego of Cross-Defendant

L.J. Dolloff Associates of New Mexico, Inc. ("Dolloff New Mexico"); and (ii) whether the Court should allow Defendant/Counter-Plaintiff Steven Nance to pierce the Dolloff entities' corporate veil. Because the Court concludes that Nance has not established by a preponderance of the evidence that Dolloff New York is the alter ego of Dolloff New Mexico, the Court will enter judgment on Dolloff New York's behalf.

## PROCEDURAL BACKGROUND

On August 19, 2004, Plaintiff Certain Underwriters at Lloyd's, London, subscribing to policy number 501/NB03ACMD ("Underwriters"), filed the operative Complaint with this Court seeking a declaration that it did not owe a duty to Nance or Dolloff New Mexico.  See Complaint for Declaratory Judgment, filed August 19, 2004 (Doc. 1).  On December 23, 2005, Nance filed an Answer, Counterclaim, Crossclaims, and Jury Demand.  See Steven Nance's Answer, Counterclaims, Crossclaims, and Jury Demand, filed December 23, 2005 (Doc. 30).  In his Answer, Nance alleges that Underwriters failed to join Dolloff New York and Dolloff New Mexico, and that both were indispensable parties.  See id. at 2.  Additionally, Nance raised counterclaims against Underwriters, and crossclaims against Dolloff New York and Dolloff New Mexico.  Subsequent to filing his Answer, Nance filed a motion requesting that the Court add Dolloff New York as an indispensable party pursuant to rule 19 of the Federal Rules of Civil Procedure.  See Steven Nance's Motion to Join Indispensable Party and Memorandum in Support Thereof, filed December 23, 2005 (Doc. 29).  Underwriters did not object to the joinder, and the Court granted Nance's request, joining Dolloff New York as an Additional Party Defendant.  See Order, filed December 31, 2005 (Doc. 33).

On December 6, 2006, Dolloff New York filed a motion to sever the trial of Nance's claims

against it from the trial of the claims between Underwriters and Nance.  See Third Party Defendant L.J. Dolloff & Associates, Inc.'s Motion to Sever Nance's Claim Against Dolloff New York and for Separate Trial of that Claim Prior to Trial of Nance's Claims Against Underwriters, filed December 6, 2006 (Doc. 103).  The Court granted Dolloff New York's motion to sever the trials on April 23, 2007.  See Memorandum Opinion and Order, filed April 23, 2007 (Doc. 152).  The Court held a bench trial of Nance's claims against Dolloff New York from May 29, 2007 through May 31, 2007.

## FINDINGS OF FACT

1.      Dolloff New York is a New York corporation.  See Pretrial Order for Phase I, Part IV.A, Stipulated Factual Contentions, at 6, filed May 23, 3007 (Doc. 161)("Stipulated Facts").  Dolloff New Mexico was a New Mexico corporation until it was dissolved in 2003.  See id.

2.      At all relevant times, Lawrence Dolloff resided in Buffalo, New York.  See id.  At all relevant times, from 1995 to his death on November 27, 2002, James Gorman resided in Albuquerque, New Mexico.  See id.

3.      Before moving to Albuquerque, Gorman was an officer  of Dolloff New York.  See Exhibit 20, Letter from Lawrence J. Dolloff to James J. Gorman (dated October 18, 1991); Exhibit 23, Letter from Lawrence J. Dolloff to James J. Gorman (dated October 1, 1992).  Gorman and Dolloff worked together "off and on" as colleagues for a period of approximately twenty years before Gorman relocated to New Mexico.  Transcript of Trial at 40:20-22 (Dolloff)(taken May 29-31, 2007)("Transcript").

4.      In 1995, after relocating to Albuquerque, Gorman began performing some work for Dolloff New York as an independent contractor.  See Exhibit 40, Memorandum from Anita Neenan to All Personnel (dated July 31, 1995).  Gorman and Dolloff New York established an arrangement

concerning Gorman's compensation and the split of fees for the work he performed.  See Exhibit

43, Memorandum from Anita Neenan to Carol Wohler (dated September 7, 1995).  Eventually,

Gorman decided to open Dolloff New Mexico.  See Transcript at 279:18-21 (Dolloff).

     5.    Dolloff New York was not looking to expand its business operations to New Mexico

and would not have done business in New Mexico had Gorman not relocated to Albuquerque.  See

id. at 301:12-17 (Dolloff).

     6.    On August 9,1995, Gorman requested information from the New Mexico Department

of Insurance ("DOI") about applying for a New Mexico Agents' License for Property and Casualty

Insurance and an Excess and Surplus Lines License.  See Stipulated Facts at 6.  On or about

February 20, 1996, the DOI issued an Agents License for Property, Casualty, Surety and Auto

insurance to Gorman; Gorman also obtained an excess and surplus lines license in 1996.  See id.

     7.    The New Mexico Public Regulation Commission ("PRC") approved and filed Dolloff

New Mexico's Articles of Incorporation on March 26, 1996.  See id.  Gorman and Lawrence Dolloff

were Dolloff New Mexico's initial directors.  See id.  Gorman was listed as President of Dolloff

New Mexico; Dolloff was Secretary and Treasurer.  See id. at 7.  Gorman was designated as Dolloff

New Mexico's agent for service of process and remained its agent until his death in November 2002.

See id. at 6.  Dolloff New Mexico was authorized to issue 100 shares of common stock.  See id.  It

issued fifty shares to Gorman and fifty shares to Dolloff.  See id.  Dolloff contributed $50,000.00

of capital to establish Dolloff New Mexico.  See Exhibit 156, Letter from James J. Gorman to

Lawrence J. Dolloff at 1 (dated August 1, 1997)("Acknowledgment Letter"); Transcript at 107:7-9;

280:8-12 (Dolloff).  Dolloff New York never owned any shares of Dolloff New Mexico.

     8.    During the existence of Dolloff New Mexico, Dolloff New York accepted

submissions from Dolloff New Mexico and was able to place many of the risks in various insurance markets; Dolloff New Mexico, however, also did business with other insurance brokers.  <u>See</u> Exhibit 102, Memorandum from James Gorman to Claudia Martin (dated June 17, 1996); Exhibit 115, Memorandum from Denise Samspon to L.J. Dolloff Assoc. of NM, Inc. (dated December 18, 1996); Transcript at 328:18-25 (Dolloff); <u>id.</u> at 598:17-21 (M. Dolloff).  When Dolloff New Mexico did business through Dolloff New York, both entities would earn commissions on the transaction.  <u>See</u> Transcript at 605:2-6 (M. Dolloff).

9.      Dolloff's brother, Paul Dolloff, an attorney in Buffalo, New York, was Dolloff New Mexico's legal counsel.  <u>See</u> Stipulated Facts at 9; Exhibit 69, Letter from Paul W. Dolloff to State Corporation Commission (dated March 21, 1996).  Paul Dolloff suffered a stroke in September 2001 and was not capable of assisting in the location or production of the corporate records for Dolloff New Mexico.  <u>See</u> Transcript at 274:11-15; 341:13-18 (Dolloff).  Dolloff's nephew, Michael Dolloff, was previously a senior vice-president of marketing and administration of Dolloff New York.  <u>See</u> Stipulated Facts at 10.  Michael Dolloff communicated with Gorman several times a week concerning Dolloff New Mexico's business.  <u>See</u> Transcript at 529:21-24; 530:19-20 (M. Dolloff).

10.      Dolloff New Mexico operated out of Gorman's home; it did not maintain any separate office.  <u>See</u> <u>id.</u> at 459:19-21 (Gorman).  Gorman and his wife, Marsha Gorman, were Dolloff New Mexico's sole employees.  <u>See</u> <u>id.</u> at 334:5-7 (Dolloff); <u>id.</u> at 500:15-19 (Gorman).  Dolloff New York arranged for Ms. Gorman to have health insurance and for life insurance policies for Gorman and Ms. Gorman.  <u>See</u> Stipulated Facts at 9.

11.      Dolloff New York allocated a percentage of its employees' time to working on

matters related to Dolloff New Mexico.  <u>See</u> Exhibit 133, Minutes of a Special Meeting of L.J. Dolloff & Associates, Inc. at 2 (dated March 11, 1997).  Dolloff New Mexico did not pay any portion of the salaries of Dolloff New York employees.  <u>See</u> Transcript at 284:10-285:16 (Dolloff). Dolloff New York allocated a percentage of its corporate expenses to work performed for, or in association with, Dolloff New Mexico.  <u>See</u> Exhibit 244, L.J. Dolloff & Associates: Year Ending 12/31/97 - Tax Entity Reporting ("DNY 1997 Summary"); Transcript at 386:18-21 (Dolloff); <u>id.</u> at 542:6-19 (M. Dolloff).  Dolloff New York assisted Dolloff New Mexico because Dolloff was a shareholder in Dolloff New Mexico.  <u>See</u> Transcript at 591:23-592:18; 664:9-11 (M. Dolloff).

12.     Gorman communicated directly with Dolloff New York employees and instructed them on matters concerning Dolloff New Mexico.  <u>See</u> Exhibit 155, Facsimile Transmission from L.J. Dolloff & Associates of New Mexico Inc. to Mike Dolloff (dated July 23, 1997); Exhibit 157, Facsimile Transmission from L.J. Dolloff & Associates of New Mexico Inc. to Bill Schaffstall (dated August 18, 1997); Exhibit 160, Facsimile Transmission from L.J. Dolloff & Associates of New Mexico Inc. to Bill Schaffstall (dated September 30, 1997); Exhibit 174, Facsimile Transmission from L.J. Dolloff & Associates of New Mexico Inc. to Bill Schaffstall (dated December 17, 1997); Exhibit 194, Letter from James J. Gorman to Michael Dolloff (dated August 30, 1998).  Gorman made personnel and other business decisions without seeking the advice or consent of Dolloff or other Dolloff New York employees.  <u>See</u> Exhibit 302, Facsimile Transmission from James J. Gorman to Bill Schaffstall (dated May 24, 1999); Exhibit 364, Facsimile Transmission from James J. Gorman to Michael Dolloff; Transcript at 444:15-17 (Dolloff).

13.     Gorman and Ms. Gorman received salaries for their work for Dolloff New Mexico. <u>See</u> Exhibit 172, Facsimile Transmission from L.J. Dolloff & Associates of New Mexico Inc. to Bill

Schaffstall (dated December 17, 1997); Exhibit 175, Facsimile Transmission from L.J. Dolloff & Associates of New Mexico Inc. to Larry Dolloff (dated December 18, 1997); Exhibit 331, Facsimile Transmission from James J. Gorman to Michael Dolloff (dated September 7, 1999); Transcript at 347:14-16 (Dolloff). Dolloff did not receive a salary, or any other income or dividend, from Dolloff New Mexico, with the exception of a few, small Christmas bonuses. <u>See</u> Exhibit 162, Letter from L.J. Dolloff & Associates of New Mexico Inc. to Larry Dolloff (dated October 22, 1997); Exhibit 260, Facsmile Transmission from James J. Gorman to Larry Dolloff (dated November 17, 1998); Transcript at 347:20-21 (Dolloff). The only income Dolloff New York received from Dolloff New Mexico was from commissions resulting from having placed insurance business that Dolloff New Mexico provided in the London or other insurance markets. <u>See</u> Transcript at 348:17-349:5 (Dolloff).

14.     Employees of Dolloff New York occasionally drafted correspondence related to Dolloff New Mexico on Dolloff New York letterhead. <u>See</u> Exhibit 127, Facsimile Transmission from Lawrence J. Dolloff to James J. Gorman (dated February 4, 1997); Exhibit 130, Memorandum from Nancy Connors to Carol Wohler (dated February 18, 1997); Exhibit 371, Facsimile Transmission from Larry Dolloff to James J. Gorman (dated December 20, 1999). Correspondence was also sent to clients and vendors containing both the "L.J. Dolloff & Associates, Inc." name and the Albuquerque address of Dolloff New Mexico, and/or Gorman's name and the Buffalo address of Dolloff New York. <u>See</u> Exhibit 259, Facsimile Transmission from Marsha Gorman to Mr. B at 2 (dated November 2, 1998); Exhibit 262, Westchester Premium Acceptance Corp. Statement of Unearned Premiums and/or Commissions; Exhibit 296, Letter from Dale M. Armstrong to James Gorman (dated April 28, 1999).

15.     At Gorman's direction, Dolloff New York employees established a separate "operating" bank account and a separate "premium" bank account in Dolloff New Mexico's name in a Buffalo bank, and used these accounts to conduct business for Dolloff New Mexico.  See Exhibit 84, Facsimile Transmission from Jim Gorman to Anita (dated April 18, 1996); Exhibit 85, Facsimile Transmission from Anita Neenan to JJG (dated April 18, 1996); Exhibit 131, Memorandum from Nancy Connors to Carol Wohler (dated February 18, 1997).  Dolloff's personal secretary, Anita Neenan, had signature authority on Dolloff New Mexico's operating account.  See Stipulated Facts at 10.  Gorman did not have signature authority for either of Dolloff New Mexico's accounts.  See Exhibit 140, Facsimile Transmission from Jim Gorman to Anita (dated April 11, 1997); Transcript at 132:9-14 (Dolloff); id. at 461:2-3 (Gorman).

16.     Commissions and monies that belonged to Dolloff New York and Dolloff New Mexico were never commingled in the accounts that were set up for Dolloff New Mexico.  See Transcript at 346:20-25 (Dolloff).  Gorman personally kept track of the commissions that Dolloff New Mexico earned.  See Exhibit 143, Comm. Statement Third Quarter 2/1/97 - 4/30/97; Exhibit 177, Facsimile Transmission from L.J. Dolloff & Associates of New Mexico Inc. to Anita (dated December 19, 1997); Exhibit 178, Letter from James Gorman to Larry Dolloff (dated December 31, 1997); Transcript at 383:20-24 (Dolloff); id. at 668:15-18 (M. Dolloff).

17.     Dolloff New Mexico never issued checks from its accounts to pay Dolloff New York for underwriting fees that Dolloff New York charged Dolloff New Mexico.  See Transcript at 300:17-23 (Dolloff).

18.     At Dolloff's request, Mike Conroy, a certified public accountant located in Clearwater, Florida, prepared Dolloff New Mexico's tax returns in 1997, 1998, and 2000.  See

Stipulated Facts at 10.  Bill Schaffstall, Dolloff New York's bookkeeper, provided the pertinent information to Conroy.  See Transcript at 288:20-289:2; 295:4-6 (Dolloff).  Dolloff was Treasurer of Dolloff New Mexico, but is not an accountant and did not personally complete tax or accounting forms on Dolloff New Mexico's behalf.  See id. at 287:10-15 (Dolloff).

19.     Gorman did not have physical access to Dolloff New Mexico's financial records, which were maintained in Buffalo.  See Exhibit 140, Facsimile Transmission from Jim Gorman to Anita (dated April 11, 1997); Transcript at 238:16-18 (Dolloff); id. at 459:4-8 (Gorman).  Gorman did not have access to Dolloff New Mexico's bank accounts.  See Transcript at 461:4-5 (Gorman).  Gorman regularly requested copies of Dolloff New Mexico's financial records from Dolloff and employees of Dolloff New York.  See Exhibit 122, Facsimile Transmission from James Gorman to Bill - Accounting (dated January 15, 1997); Transcript at 342:11-14 (Dolloff).  Dolloff New York sent Gorman copies of the records when he made his requests.  See Exhibit 181, Letter from James J. Gorman to Bill Schaffstall (dated January 20, 1998); Exhibit 182, Letter from James J. Gorman to Bill Schaffstall (dated January 20, 1998); Exhibit 274, New Mexico Commissions Sept 98 - Nov 98 (dated January 25, 1999); Transcript at 342:21-23; 393:20-23 (Dolloff).

20.     Gorman regularly visited Dolloff New York's offices in Buffalo to discuss Dolloff New Mexico's business, and to review the books and records of Dolloff New Mexico contained in New York.  See Transcript at 669:4-18 (M. Dolloff).

21.     In December 1997, Fighting Back Action Training Institute, Inc. ("Fighting Back"), a karate school in Albuquerque, contacted Clarence Dziak of Associated Insurance Professionals, Inc. about obtaining a liability insurance policy.  See Stipulated Facts at 7.  Dziak contacted Gorman regarding a policy for Fighting Back.  See id.

22.     On December 12, 1997, Gorman sent a facsimile transmission to Dziak confirming that coverage was bound.  See id.  The terms of the coverage included an exclusion for "students that participate in martial arts classes and events."  Id.  Gorman did not have authority to bind coverage. See Exhibit 166, Facsimile Transmission from Michael Dolloff to Jim Gorman (dated December 15, 1997); Transcript at 389:11-13 (Dolloff); id. at 582:6-11 (M. Dolloff); id. at 722:19-21 (Menicucci).

23.     On December 15, 1997, Gorman sent Fighting Back's application to Dolloff New York -- a wholesale insurance broker -- with a request to bind coverage.  See Stipulated Facts at 7. Two days later, on December 17, 1997, Dolloff New York sent Gorman a facsimile transmission indicating that the London insurer had declined to bind coverage for Fighting Back.  See id.

24.     Nance was injured at Fighting Back on January 20, 1998.  See id.  On January 30, 1998, Nance's counsel advised Fighting Back of Nance's injury and his claim against Fighting Back, and requested that Fighting Back inform its insurers of the claim.  See id.

25.     On February 2, 1998, in response to the inquiry from Nance's counsel regarding a policy for Fighting Back, Gorman sent a facsimile transmission to Dziak advising that he was issuing a notice of cancellation for the policy.  See id.  On June 10, 1998, Gorman sent a letter to Nance's counsel explaining that "coverage was verbally bound on December 12, 1998 and subsequently canceled flat."  Id.  Gorman concluded that "no coverage was afforded by Lloyds of London or any other insurer via this office."  Id.

26.     Nance filed a personal injury complaint against Fighting Back on July 22, 1998.  See id.  Before March 2000, Nance entered into an agreement with Fighting Back; under the terms of the agreement: (i) Nance obtained a default judgment against Fighting Back; (ii) Nance agreed not to execute on the assets of Fighting Back to satisfy the judgment; (iii) Fighting Back assigned to

Nance its rights for indemnification, contribution, or recovery under any other theory of liability with regard to the incident in which Nance was injured.  See id. at 8.  Pursuant to the agreement between Nance and Fighting Back, Nance obtained a default judgment in the amount of $751,022.00.  See id.

27.     Gorman and Dolloff routinely disputed the profitability of Dolloff New Mexico, and Gorman exchanged correspondence with Dolloff New York employees evidencing his dissatisfaction with the accounting that was being done on Dolloff New Mexico's behalf and the compensation he was receiving.  See Exhibit 202, Letter from James J. Gorman to Bill Schaffstall (dated February 10, 1998); Exhibit 221, Facsimile Transmission from L.J. Dolloff & Associates of New Mexico, Inc. to Bill Schaffstall (dated May 13, 1998); Exhibit 225, Facsimile Transmission from William Schaffstall to Jim (dated May 14, 1998); Exhibit 312, Letter from Michael P. Dolloff to James Gorman (dated June 14, 1999); Exhibit 313, Letter from Unknown Sender to Lawrence J. Dolloff (dated July 1, 1999).  Gorman frequently attempted to verify independently the financial information he received from Dolloff New York.  See Exhibit 53, Facsimile Transmission from Anita Neenan to James Gorman (dated October 18, 1995); Exhibit 122, Facsimile Transmission from L.J. Dolloff & Associates of New Mexico Inc. to Bill - Accounting (dated January 15, 1997).

28.     In April 1999, Michael Dolloff wrote to Gorman to advise him that Dolloff New York was seeking to reduce its costs, and that, as of June 1, 1999, Dolloff New York would no longer pay Dolloff New Mexico's expenses or incur expenses on Dolloff New Mexico's behalf .  See Exhibit 292, Letter from Michael Dolloff to James J. Gorman at 1 (dated April 16, 1999); Transcript at 670:5-11 (M. Dolloff).

29.     Dolloff requested that Gorman commence the dissolution of Dolloff New Mexico in

September 1999.  See Exhibit 326, Letter from Michael P. Dolloff to James J. Gorman (dated September 2, 1999).  In a letter dated September 2, 1999, Michael Dolloff informed Gorman that, "[g]iven our current state, New Mexico operations is not a viable venture for us at this time."  Id.

30.     In October 1999, Gorman contacted Dolloff to discuss how the two should distribute Dolloff New Mexico's tangible property at the end of 1999.  See Exhibit 344, Facsimile Transmission from James J. Gorman to Michael Dolloff (dated October 22, 1999).  Dolloff New Mexico ceased doing business as of December 31, 1999, and Gorman resigned as of that date.  See Exhibit 370, Statement of Suspension of Business (dated December 20, 1999)("Statement of Suspension"); Transcript at 308:10-12 (Dolloff).  Both Gorman and Dolloff signed and filed the necessary documents with the PRC to suspend the business of Dolloff New Mexico in anticipation of dissolving the corporation and terminated its unemployment insurance account.  See Statement of Suspension at 3.

31.     In early 2000, Dolloff New Mexico received some additional income arising from placements made before the termination of Dolloff New Mexico's business.  See Transcript at 305:15-19 (Dolloff); id. at 710:13-16 (Menicucci).  At the time Dolloff New Mexico ceased doing business at the end of 1999, all of its accounts with creditors and vendors were satisfied.  See id. at 327:19-22 (Dolloff).

32.     Gorman formed a new insurance brokerage, Great Southwest Underwriters, Inc. ("GSU"), which commenced doing business in Albuquerque on January 3, 2000.  See Exhibit 376, Great Southwest Underwriters, Inc. Business Announcement; Exhibit 385, Facsimile Transmission from James J. Gorman to Larry Dolloff (dated January 4, 2001); Transcript at 304:13-17 (Dolloff). Gorman transferred at least some of Dolloff New Mexico's existing business to GSU.  See Exhibit

343, Facsimile Transmission from James J. Gorman to Michael Dolloff (dated October 21, 1999). Neither Dolloff nor Dolloff New York had any ownership interest in GSU.  See Transcript at 304:19-24 (Dolloff).  Dolloff New York did not attempt to retain for itself any business that Dolloff New Mexico had initiated.  See id. at 680:9-13 (M. Dolloff); id. at 725:24-726:2 (Menicucci).

33.     On or about February 7, 2001, Gorman, as President of Dolloff New Mexico, wrote to Dolloff advising him of an emergency meeting of the Dolloff New Mexico's Board of Directors to be held on February 12, 2001.  See Stipulated Facts at 9.  The February 7, 2001 letter from Gorman to Dolloff stated that the Board would consider, among other issues: (i) "the corporation has formally suspended business with the State of New Mexico, however, the company was not terminated[;]" and (ii) "termination of the current Treasurer, Lawrence J. Dolloff, due to bad faith and failure to correspond with the President regarding financial matters and wrongful conversion of this corporation's funds by the treasurer to another corporation 100% under the control of Lawrence J. Dolloff."  Id. at 9-10.

34.     On March 8, 2001, Gorman filed a complaint, in his individual capacity, against Dolloff New York for commissions he alleged Dolloff New York owed to him for the period from January 1, 2001 through June 1, 2001.  See Stipulated Facts at 8.  The complaint was filed in the Bernalillo County, New Mexico Metropolitan Court.  See id.; Gorman v. L.J. Dolloff & Assocs., Inc., No. CV0272801 (N.M. Metro. Ct. 2001)(docket available at http://www.metrocourt.state.nm.us/casemanagement/csredirect.jsp?form=civil).  On August 29, 2001, a default judgment in the amount of $4,335.02 was entered in Gorman's favor.  See Stipulated Facts at 8.  On August 7, 2002, Gorman acknowledged payment in full of his judgment against Dolloff New York.  See id.

-13-

35.     On August 8, 2002, Gorman sent Dolloff a "Domestic Profit Dissolution" form for Dolloff New Mexico.  Id.  Gorman instructed Dolloff to sign the papers and represented that he would file them with the PRC at the time Dolloff New Mexico was dissolved.  See id.  In August 2002, Dolloff signed: (i) a "Statement of Intent to Dissolve by Written Consent of Shareholders;" (ii) a "Statement of Intent to Dissolve by Act of the Corporation;" and (iii) Articles of Dissolution for Dolloff New Mexico.  Id.  Gorman filed a Statement of Intent to Dissolve and Articles of Dissolution with the PRC on August 20, 2002.  See id.

36.     On August 22, 2002, the PRC informed Gorman that the Articles of Dissolution and the Statement of Intent to Dissolve Dolloff New Mexico had been disapproved, and instructed him to correct and re-submit the Articles of Dissolution.  See Stipulated Facts at 9.  Gorman did not correct and re-submit the documentation.  See id.  Gorman died on November 27, 2002.  See id.  Gorman did not inform Dolloff New York that the PRC disapproved Dolloff New Mexico's dissolution.  See Transcript at 321:2-5 (Dolloff).

37.     On May 2, 2003, Nance initiated his first attempt to collect the proceeds of the judgment against Fighting Back, suing Dolloff New Mexico and Dolloff New York in New Mexico state district court.  See Stipulated Facts at 9; Nance v. L.J. Dolloff Assocs. of N.M., Inc., No. CV-03-03133 (N.M. Second Jud. Dist. 2003)("Nance - State I").    Nance alleged negligent misrepresentation, unfair insurance practices, and bad faith.  See Stipulated Facts at 9.

38.     On May 5, 2003, Ms. Gorman advised the PRC that Gorman was deceased and would no longer be the registered agent for Dolloff New Mexico.  See Stipulated Facts at 9.  On May 9, 2003, Ms. Gorman advised Dolloff that Gorman had been removed as the registered agent and that Dolloff New Mexico still needed to be dissolved.  See Exhibit 406, Memorandum from Marsha R.

Gorman to Larry Dolloff (dated May 9, 2003).  On the same day, Ms. Gorman provided Dolloff with the summons from <u>Nance-State I</u> and indicated that "Dolloff New Mexico will need to be dissolved."  Stipulated Facts at 9.

39.    On June 4, 2003, Dolloff advised the PRC that it was his understanding that Dolloff New Mexico had been dissolved in August 2002.  <u>See</u> Exhibit 407, Letter from Lawrence J. Dolloff to Ann Echols (dated June 4, 2003).  On June 11, 2003, the PRC informed Dolloff that his understanding was incorrect, and that, while Gorman had attempted to dissolve the corporation, the documents he submitted had been returned to him for corrections and supplementation on August 22, 2002.  <u>See</u> Exhibit 410, Letter from Robbie K. Lambert to Lawrence J. Dolloff (dated June 11, 2003).  The PRC enclosed a packet of forms and instructions for the dissolution procedure in its June 11, 2003 letter to Dolloff.  <u>See id.</u>

40.    On July 24, 2003, Chicago Insurance Company paid Nance $145,000.00, as Fighting Back's assignee.  <u>See</u> Stipulated Facts at 9.

41.    On August 1, 2003, the trial court in <u>Nance-State I</u> granted Nance's motion for a default judgment against Dolloff New Mexico and entered an order stating that a default judgment would be entered for failure to appear after the court heard evidence on the issue of damages.  <u>See</u> Stipulated Facts at 10.  Dolloff was deposed in <u>Nance - State I</u> on August 8, 2003.  <u>See</u> Exhibit 415, Deposition of Lawrence Dolloff (taken August 8, 2003); Exhibit 433, Facsimile Transmission from Jose R. Gonzalez to L. Edward Glass (dated December 23, 2003).

42.    The Articles of Dissolution, which Dolloff signed on September 8, 2003, include the representations that "all debts, obligations and liabilities of the corporation have been paid and discharged or adequate provision has been made therefore," and that "[t]here are no suits pending

against the corporation in any court, or adequate provision has been made for the satisfaction of any

judgment, order or decree that may be entered against it in any pending suit." Exhibit 456, Articles

of Dissolution, Art. Three.  Dolloff filed a Statement of Intent to Dissolve with the PRC on

September 19, 2003.  See id., Art. Two.

43.    Dolloff formally resigned as a shareholder and secretary of Dolloff New Mexico on

September 23, 2003.  See Exhibit 418, Letter from Lawrence J. Dolloff to James J. Gorman or his

successors (dated September 23, 2003); Exhibit 419, Letter from Lawrence J. Dolloff to L.J. Dolloff

Associates of New Mexico, Inc. (dated September 23, 2003).

44.    On October 6, 2003, Dolloff signed a sworn statement certifying that Dolloff New

Mexico had not engaged in business in New Mexico since September 8, 2003.  See Exhibit 456,

Corporation Certificate of No Tax Due.  The form Dolloff signed indicated that the form should be

completed and signed "by an official of the corporation."  Id.

45.    On April 27, 2004, Nance obtained a default judgement in Nance-State I against

Dolloff New Mexico in the amount of $1,043,286.24.  See Stipulated Facts at 10.  The judgment in

Nance-State I was based on Nance's judgment against Fighting Back and pre-judgement interest at

the rate of 8.75% from the date of entry of judgment in the prior action against Fighting Back on

March 3, 2000.  See Stipulated Facts at 10.

## CONCLUSIONS OF LAW

1.    The typical application of the alter-ego theory involves an attempt "to pierce the

corporate veil, to disregard the separate nature of a corporation and its subsidiary for purposes of

liability." Alto Eldorado P'ship v. Amrep Corp., 2005-NMCA-131, ¶ 19, 124 P.3d 585, 592 (citing

Scott v. AZL Res., Inc., 107 N.M. 118, 121, 753 P.2d 897, 900 (1988)).  The Supreme Court of New

Mexico has held that piercing the corporate veil is an equitable remedy.  See AG Servs. of Am., Inc. v. Nielsen, 231 F.3d 726, 737 (10th Cir. 2000)(citing Scott v. AZL Res., Inc., 107 N.M. at 121, 753 P.2d at 900); Harlow v. Fibron Corp., 100 N.M. 379, 382, 671 P.2d 40, 43 (1983)("The heart of most corporate veil cases, explicitly or implicitly, is that a corporation has been used for such an improper purpose that equity will permit its corporate form to be disregarded.")(internal quotations omitted). A party seeking to pierce the corporate veil must satisfy three requirements to be eligible for this equitable relief: (i) a showing of instrumentality or domination; (ii) improper purpose; and (iii) proximate causation.  See Scott v. AZL Res., Inc., 107 N.M. at 121, 753 P.2d at 900.

2.      New Mexico decisions have equated the instrumentality or domination requirement with the alter-ego doctrine.  See id. (citing Harlow v. Fibron Corp., 100 N.M. at 382, 671 P.2d at 43); Cruttenden v. Mantura, 97 N.M. 432, 434, 640 P.2d 932, 934 (1982).  To satisfy the instrumentality requirement, a party asserting the alter-ego theory "must prove that the subsidiary or other subservient corporation was operated not in a legitimate fashion to serve the valid goals and purposes of that corporation but that it functioned under the domination and control and for the purposes of some dominant party."  Harlow v. Fibron Corp., 100 N.M. at 382, 671 P.2d at 43 (quoting Krendl & Krendl, Piercing the Corporate Veil: Focusing the Inquiry, 55 Denv. L.J. 1, 16 (1978)).

3.      The Supreme Court of New Mexico has identified factors that guide the court in determining whether an entity is an instrument of or under the domination of another entity:

(1) The parent corporation owns all or majority of the capital stock of the subsidiary.

(2) The parent and subsidiary corporations have common directors or officers.

(3) The parent corporation finances the subsidiary.

(4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.

(5) The subsidiary has grossly inadequate capital.

(6) The parent corporation pays the salaries or expenses or losses of the subsidiary.

(7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

(8) In the papers of the parent corporation, and in the statements of its officers, "the subsidiary" is referred to as such or as a department or division.

(9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation.

(10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

Cruttenden v. Mantura, 97 N.M. at 434, 640 P.2d at 934 (quoting UAW v. Cardwell Mfg. Co., 416

F. Supp. 1267, 1286 (D. Kan. 1976)).  See Robertson v. Rocky Mountain Metals, Inc., 2006-NMCA-

101, ¶ 13, 142 P.3d 29, 33 (citing Cruttenden v. Mantura, 97 N.M. at 434, 640 P.2d at 934).  None

of these guidelines is dispositive alone, as "these are only factors for the trial court to consider in

determining whether or not to recognize the corporations as separate entities."  Cruttenden v.

Mantura, 97 N.M. at 434, 640 P.2d at 934.

4.      Gorman and Dolloff were the sole shareholders of Dolloff New Mexico.  Dolloff

New York did not hold any ownership interest in Dolloff New Mexico.

5.      After moving to Albuquerque, Gorman had no official role in Dolloff New York.

Although Dolloff was designated Secretary and Treasurer of Dolloff New Mexico, Nance has not

presented evidence sufficient to prove by a preponderance of the evidence that he was personally

involved in completing tax, accounting, or other financial work on Dolloff New Mexico's behalf.

Gorman regularly communicated with Dolloff New York employees other than Dolloff on matters

related to Dolloff New Mexico and regularly made decisions affecting Dolloff New Mexico without consulting Dolloff.

6.      Dolloff contributed $50,000.00 of capital to establish Dolloff New Mexico.  Nance has not presented evidence, however, that Dolloff New York invested any money in shares of Dolloff New Mexico or had any ownership interest in Dolloff New Mexico.  A number of Dolloff New York employees, however, spent a percentage of their time working on matters related to Dolloff New Mexico, and Dolloff New Mexico did not pay any portion of these employees' salaries. Nevertheless, the Court does not believe that Nance has proved by a preponderance of the evidence that Dolloff New York financed Dolloff New Mexico.  Michael Dolloff testified that Dolloff New York employees worked on Dolloff New Mexico matters because Dolloff, the president of Dolloff New York, was a shareholder in Dolloff New Mexico.  See Transcript at 591:23-592:18; 664:9-11 (M. Dolloff).  Once incurring expenses on Dolloff New Mexico's behalf became untenable for Dolloff New York, however, Michael Dolloff wrote to Gorman to advise him that Dolloff New York would no longer pay Dolloff New Mexico's expenses or incur additional expenses on Dolloff New Mexico's behalf.  In sum, the Court believes that, rather than financing Dolloff New Mexico as a related company or a subsidiary, Dolloff New York assisted Dolloff New Mexico as a favor to Dolloff.  When it became clear that this assistance was impacting Dolloff New York's bottom line, Dolloff New York informed Gorman, the President of Dolloff New Mexico, that it would no longer incur expenses on Dolloff New Mexico's behalf.

7.      Nance has not proven by a preponderance of the evidence that Dolloff New York had any role in establishing Dolloff New Mexico or has an interest in any of its stock.  Nance has not presented evidence that Dolloff New York had an interest in expanding its business to New Mexico

or that it would have done business in New Mexico had Gorman not relocated to Albuquerque.

8.    Nance has not demonstrated by a preponderance of the evidence that Dolloff New Mexico had grossly inadequate capital.  Dolloff testified that he contributed $50,000.00 to establish Dolloff New Mexico, and in a letter dated August 1, 1997, Gorman indicated to Dolloff that he "would like to take this opportunity to thank you for your investment back in August 1995 which got things started." Acknowledgment Letter at 1.  Dolloff New York operated from Gorman's home and Gorman and Ms. Gorman were its only employees.  Dolloff New York employees performed clerical and administrative duties for Dolloff New Mexico for which the latter was not charged. While Nance has presented evidence that Gorman frequently disagreed with Dolloff New York employees' calculations concerning Dolloff New Mexico's profitability, he has not presented evidence that indicates Gorman was not afforded adequate resources to carry on operations.

9.    The parties have presented evidence that Gorman and Ms. Gorman received salaries, and that Dolloff New York incurred losses in association with work that it performed for, or in association with, Dolloff New Mexico.  The parties have not presented evidence, however, that proves beyond a preponderance of the evidence that Dolloff New York paid the Gormans' salaries or that Dolloff New York absorbed the expenses or losses of Dolloff New Mexico.  While Nance points to Dolloff New York's 1997 Internal Summary, a document that lists a negative number for Dolloff New Mexico in a category labeled "Allocation of Corporate Expenses Based on % of Net Revenue," DNY 1997 Summary, he has not presented evidence that Dolloff New York ever made any payment in association with this figure.  Nance did not present testimony from any witness who assisted in the creation of the 1997 Summary.  Neither Dolloff nor Michael Dolloff was familiar with the accounting or tax purposes for which the summary was created, or was able to explain

adequately to the Court, or to Dolloff New York's expert, Mark Menicucci, how the figure was calculated.  See Transcript at 751:2-7 (Menicucci)(indicating that he could not understand Dolloff's explanation of the origin of the negative figure in the DNY 1997 Summary).  Even assuming that figure in the 1997 summary represents a real loss suffered, the Court is uncertain whether the figure represents a loss that Dolloff New York or Dolloff New Mexico suffered.  The Court does not believe that Nance has demonstrated by a preponderance of the evidence that Dolloff New York absorbed Dolloff New Mexico's losses.

10.     Menicucci testified that it was to Gorman's advantage to have an established relationship with Dolloff and with Dolloff New York.  See Transcript at 732:25-733:10 (Menicucci). Because Dolloff New York had binding authority from Lloyd's and other insurers, Gorman could capitalize on his relationship with Dolloff New York to secure coverage for hard-to-place polices. Gorman's association with Dolloff may also have lent him credibility with other insurance vendors who may not have been familiar with his firm.  Nance has not established by a preponderance of the evidence, however, that Dolloff New Mexico had substantially no business except that which it conducted with Dolloff New York or that it lacked assets except those which Dolloff New York conveyed to it. To the contrary, the parties have presented evidence that Gorman did business with other insurance brokers, including other large brokers such as AIG and Fireman's Fund.

11.     Nance has not presented evidence adequate to establish that Dolloff New York routinely referred to Dolloff New Mexico as its subsidiary, or that it considered Dolloff New Mexico a department or division of Dolloff New York.   While it is true that Dolloff New York employees occasionally drafted correspondence on matters related to Dolloff New Mexico on Dolloff New York letterhead, and may have informally referred to Dolloff New Mexico as an office or branch,

the Court does not believe these references are dispositive.  Dolloff New Mexico was established as an independent corporation; the forms it submitted to the PRC do not indicate any affiliation with Dolloff New York or any other company.  Its letterhead did not reference an affiliation with Dolloff New York or any other company.  Gorman, the company's president, repeatedly asserted in correspondence that he was not an employee of Dolloff New York and that Dolloff New York employees such as Michael Dolloff did not have any interest in Dolloff New Mexico.

12.    The Court believes that Gorman acted independently in the interest of Dolloff New Mexico.  Gorman communicated directly with Dolloff New York employees and instructed them on matters concerning Dolloff New Mexico.  As Dolloff New Mexico's president, Gorman made personnel and other business decisions without seeking the advice of Dolloff or other Dolloff New York employees.  While the parties presented evidence that Dolloff New Mexico placed insurance policies through Dolloff New York, they did not present evidence that Dolloff New York instructed Gorman with regard to the clients he should pursue, the policies he could place, or that anyone at Dolloff New York had control over Gorman's day-to-day operations.  Indeed, Dolloff did not have a business presence in New Mexico before Gorman relocated to Albuquerque, and, after Dolloff New Mexico ceased doing business, Dolloff New York did not attempt to retain for itself any business that Dolloff New Mexico initiated.

13.    Gorman maintained independent records of his commissions and expenses, and was provided copies of Dolloff New Mexico financial records when he requested them.  Gorman routinely visited Dolloff New York's office in Buffalo to discuss Dolloff New Mexico's business, and to review the books and records of Dolloff New Mexico contained in New York.

14.    When Gorman became dissatisfied with his relationship with Dolloff New York, he

did not resign or leave Dolloff New Mexico, but agreed to cease doing business and to dissolve the

company.  In February 2001, Gorman called an emergency meeting of the Board of Directors and

established the termination of Dolloff as Treasurer as an agenda item for the meeting.

15.    Gorman and Dolloff established Dolloff New Mexico as a separate legal entity from

Dolloff New York.  The forms that Gorman and Dolloff submitted to the PRC did not indicate

Dolloff New Mexico was an affiliate or subsidiary of Dolloff New York.

16.    Although the Court reconize that none of the factors the Supreme Court of New

Mexico articulated in Cruttenden v. Matura are dispositive alone, see Cruttenden v. Matura, 97 N.M.

at 434, 640 P.2d at 934, the Court finds that, when it reviews the factors individually and in totality,

Nance has not established by a preponderance of the evidence that Dolloff New Mexico "functioned

under the domination and control and for the purposes of [Dolloff New York]."  Harlow v. Fibron

Corp., 100 N.M. at 382, 671 P.2d at 43.

17.    In addition to showing control, however, a party seeking to pierce the corporate veil

must  demonstrate "[s]ome form of moral culpability attributable to the parent, such as use of the

subsidiary to perpetrate a fraud."  Jemez Agency, Inc. v. Cigna Corp. & Ins. Co. of N. Am., 866 F.

Supp. 1340, 1345 (D.N.M. 1994)(Burciaga, J.)(quoting Scott v. AZL Res., Inc., 107 N.M. at 121,

753 P.2d at 900).  In assessing the improper purpose factor, "undercapitalization, sham formalities

or formation, or fraudulent manipulation or mismanagement resulting in losses, are all facts to be

considered."  Jemez Agency, Inc. v. Cigna Corp. & Ins. Co. of N. Am., 866 F. Supp. at 1345 (citing

Scott v. AZL Res., Inc., 107 N.M. at 122, 753 P.2d at 901).  This rule reflects the courts' recognition

that  "corporations are formed precisely for the purpose of insulating the owners thereof and such

purpose ought to be respected, whether for liability or jurisdiction, unless there are countervailing

reasons not to do so." Alto Eldorado P'ship v. Amrep Corp., 2005-NMCA-131, ¶ 53, 124 P.3d at 600.

18.     The Court notes that, because it has found that Nance has not satisfied the instrumentality or domination element of an alter-ego claim, it need not consider the other elements a litigant must establish to pierce the corporate veil.  Nevertheless, the Court notes that  it has already found that Dolloff New Mexico was not undercapitalized nor was it the product of a sham formation.  Moreover, Gorman and Dolloff formed Dolloff New Mexico and neither one of them is a Defendant in this alter-ego action.

19.     The Court also does not find by a preponderance of the evidence that Dolloff New York engaged in any fraudulent manipulation or mismanagement that resulted in losses to Dolloff New Mexico.  Nance has referenced underwriters' fees that he alleges Dolloff New York charged Dolloff New Mexico.  He has not pointed the Court, however, to any check, wire transfer, or other transfer of funds representing a payment of such fees by Dolloff New Mexico to Dolloff New York.  To the extent that any underwriters' fees may have been paid, Nance has failed to demonstrate that these fees were not fees to which Dolloff New York was entitled for placing insurance policies on Dolloff New Mexico's behalf.  Finally, the Court finds it significant that, on March 8, 2001 -- more than a year after Dolloff New Mexico ceased doing regular business and after Gorman had already established GSU -- Gorman filed a complaint in the Bernalillo County Metropolitan court for commissions he alleged Dolloff New York owed him.  On August 29, 2001, a default judgment in the amount of $4,335.02 was entered in Gorman's favor, and, on August 7, 2002, Gorman acknowledged payment in full of his judgment against Dolloff New York.

        **IT IS ORDERED** that Nance's claims against Dolloff New York are dismissed.  Nance has

not established that Dolloff New York is the alter-ego of Dolloff New Mexico, and the Court will

not permit Nance to pierce the corporate veil.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

R. Nelson Franse
Rodey Dickason, Sloan, Akin
  & Robb, P.A.
Albuquerque, New Mexico

-- and --

Alan H. Barbanel
Stephen D. Treuer
Barbanel & Treuer, P.C.
Los Angeles, California

> *Attorneys for the Plaintiff*

C.D. Carter
Richard J. Valle
Carter Law Firm, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendant , Counterclaimant, Crossclaimant,*
> *and Additional Party Plaintiff Steven Nance*

Steven Vogel
Albuquerque, New Mexico

> *Attorney for Additional Party Defendant*
> *L.J. Dolloff Associates, Inc.*